**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOCELYN GASTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17 C 1024 |
| | ) | |
| BOARD OF EDUCTION OF THE CITY OF CHICAGO | ) | Judge Virginia M. Kendall |
| | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Jocelyn Gaston ("Gaston"), a 57-year old African-American female and long-time Chicago Public School teacher, sued her employer, Defendant Board of Education of the City of Chicago ("the Board"), for various types of employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act ("ADEA"), including hostile work environment (Counts I, II), unequal terms and conditions of employment (Counts III, IV), retaliation (Counts V, VIII, IX, X, XI, XII), and adverse employment action (Count VI, VII). Gaston also brought a claim for the intentional infliction of emotional distress (Count XIII). Pursuant to Rule 12(b)(6), the Board moves to dismiss all of Gaston's claims except for those alleging unlawful retaliation. For the reasons stated below, the Board's Motion to Dismiss is granted in part and denied in part.

## <u>FACTS</u>

The Court takes the following allegations as true, as it is required to do at the motion to dismiss stage. *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015). Gaston, a 57-year-old African American teacher at Charles H. Wacker Elementary School, has been employed by the Board since 1986. (Dkt. 1 ¶¶ 4, 5, 8.) The Board oversees approximately 660

schools, including Wacker Elementary. (*Id.* ¶ 5.) Gaston alleges that between 2014 and 2016, Ekaterini Panagakis ("Panagakis"),Wacker's principal, harassed her in a variety of ways due to her age and race. She also alleges that Panagakis retaliated against her for filing various grievances.[1]

Specifically, Gaston alleges that as a result of her age and race, Panagakis gave Gaston her first poor performance rating in more than 25 years. (*Id.* ¶ 10.) Due to the poor performance review, Gaston was required to participate in a Professional Development Plan ("PDP") for one year and when she needed a performance score of 285 to move off of the PDP, Panagakis gave Gaston a score of 284.05 points. (*Id.* ¶¶ 10-13.) Gaston also alleges that Panagakis purposely heaped excessive amounts of assignments on her due to her race and age (*id.* ¶ 11), required that she take lunch at 10:00 am, when no Caucasian teacher at the school was directed to take lunch that early (*id.* at ¶¶ 17-18), and put a copy of Time Magazine with the headline "Rotten Apples: It's Nearly Impossible to Fire a Bad Teacher" inside Gaston's mailbox, an act that Gaston interpreted as intimidating and harassing. (*Id.* ¶¶ 12-13.) At a meeting with other school personnel present, Panagakis told Gaston she "failed" a student and refused to engage in the Response to Intervention Process for the student. (*Id.* ¶ 19.) Panagakis also allegedly harassed Gaston due to her age and race when she sent her an email about her jury duty summons, (*id.* at ¶ 20), and emailed Gaston requesting a meeting regarding a verbal confrontation with another employee, and then provided Gaston with a Pre-Meeting Notice regarding "VERBAL ABUSE." (*Id.* at ¶¶ 21-23.) Gaston has also incorporated various IDHR complaints into her complaint, one of which alleged that Panagakis directed Gaston to lead literacy classes, for which she was not qualified. (Dkt. 1-1 at 2.)

---

[1] The Board does not challenge Gaston's retaliation claims. As a result, there is no need to recite facts that solely relate to those counts.

Lastly, on January 26, 2016, one of Gaston's students closed his finger in a door and had to be taken to the hospital. (*Id.* ¶ 37.) The following day, Gaston filed an incident report per school policy. Three days later, Panagakis issued Gaston a pre-meeting notice regarding "failure to file an incident report." (*Id.* ¶ 39.) Upon receiving the notice, Gaston did not feel well and took a moment to collect herself in the classroom's closet. (*Id.* ¶ 40.) Panagakis followed her into the closet and demanded the pre-meeting notice back. (*Id.* ¶ 41.) After the incident, Gaston went to the doctor and was told that she might have had a small stroke, which resulted in constant ringing in her ear. (*Id.* ¶ 43.)

## **STANDARD OF REVIEW**

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts as true all facts alleged in the complaint and construes all reasonable inferences in favor of the plaintiff. *Firestone Fin. Corp.*, 796 F.3d at 826. To properly state a valid claim, the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not allege all facts involved in the claim and certainly does not need to include evidence. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). However, in order to survive a motion to dismiss for failure to state a claim, the claim must be supported by facts that, if taken as true, at least plausibly suggest that the plaintiff is entitled to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974 (2007). To determine whether a complaint meets this standard, the "reviewing court must draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009). Conclusory statements and abstract recitations of the elements of a cause of action, however, will not help a complaint survive a Rule 12(b)(6) motion. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010).

3

**DISCUSSION**

I.    **Title VII and ADEA Claims**

Title VII of the Civil Rights Act of 1964 makes it unlawful to discriminate against an employee based on race, color, religion, sex or national origin. 42 U.S.C. § 2000e-2. Similarly, the ADEA generally protects workers over the age of forty from age-based discrimination.  29 U.S.C. § 623.

Due to their substantive similarities, when examining ADEA claims for discrimination and hostile work environment, courts frequently look to the law interpreting similar claims under Title VII.  *See Levin v. Madigan*, 692 F.3d 607, 620 n.5 (7th Cir. 2012) ("Title VII is certainly useful in interpreting substantive provisions of the ADEA"); *see, e.g.*, *Bader v. Air Line Pilots Ass'n*, 113 F. Supp. 3d 990, 994 (N.D. Ill. 2015).

The Board argues that Gaston's hostile work environment and discrimination claim related to being forced to eat lunch at 10 a.m. should be dismissed because they are conclusory and deficient, primarily because Plaintiff engaged in "shotgun pleading" by asserting forty factual allegations and then incorporating those facts into her various counts, without specifically identifying which facts relate to each count.  (Dkt. 19 at 3.)  The Board also argues that Gaston has failed to allege any adverse actions in relation to all of her non-retaliation discrimination claims.

Although courts discourage shotgun pleading, if "there is "enough clarity to determine what Plaintiffs seek to hold," the court may decide the motion to dismiss on the basis of whether Plaintiffs have adequately stated a valid claim, rather than requiring them to re-plead their claims again. *See, e.g., Chriswell v. Vill of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at *5 (N.D. Ill. Nov. 4, 2013) *aff'd sub nom. Chriswell v. O'Brien*, 570 Fed.Appx. 617 (7th Cir. 2014).

Here, based on the allegations in Gaston's complaint and considering that Gaston's IDHR complaints are incorporated into and attached to her complaint, there is sufficient clarity to determine which allegations relate to each count. In fact, the Board's motion to dismiss succinctly identifies which allegations relate to each claim. (*See* Dkt. 19 at 6.) As such, the Court will address the Board's Motion to Dismiss on the merits.

In Counts I and II, Gaston alleges that she was subjected to a hostile work environment. To state a Title VII or ADEA[2] hostile work environment claim, a plaintiff must allege that (1) she was subject to unwelcome harassment; (2) the harassment was based on her protected status; (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833-34 (7th Cir. 2015). To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive relationship. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). This test is "sometimes phrased . . . differently, replacing the first prong—that the employee was subject to unwelcome harassment—with the requirement that the work environment was 'both subjectively and objectively offensive.'" *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 n.6 (7th Cir. 2016) (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011)).

In support of her hostile work environment claim, Gaston alleges that on the basis of her race and age, Panagakis verbally insulted her, sent her emails to attend baseless disciplinary meetings, forced Gaston to perform work functions which she was not qualified to perform, gave Panagakis a poor rating, loaded her with excessive assignments, and sent her a harassing email

---

[2] The Seventh Circuit has assumed, without deciding, that plaintiffs may bring hostile work environment claims under the ADEA and has analyzed those claims using the same standard as Title VII hostile work environment claims. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001).

about jury duty. (Dkt. 1-1 at 2.) These allegations sufficiently state a claim for hostile work environment, especially when considering that "it is premature at the pleadings stage to conclude just how abusive [plaintiff's] work environment was." *Huri*, 804 F.3d at 834. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 830 (7th Cir. 2014) (reversing dismissal of constructive discharge claim, which requires higher showing of harassment than hostile work environment, where the complaint included allegations of "regular belittlement, unfair criticism, and unduly poor assessments.").

In addition to her hostile work environment claims, Gaston also alleges that Panagakis discriminated against her on the base of her race and age when she was directed Gaston to take her lunch break at 10 a.m., while non-black employees were not forced to take their lunch break so early (Counts III and IV) and that Panagakis discriminated against her based on her race and age when she issued Gaston a written disciplinary warning on June 24, 2015 (Counts VI and VII).

The bar for surviving a motion to dismiss in employment discrimination cases is a low one. At the most basic level, "[a] complaint that identified 'the type of discrimination' the plaintiff thought occurred, 'by whom, . . . and when' was 'all [the plaintiff] needed to put in her complaint.'" *Huri*, 804 F.3d 826 at 833 (quoting *Swanson*, 614 F.3d at 405). A "complaint alleging [race] discrimination need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of [his race]." *Lavalais v. Village of Melrose Park*, 734 F.3d 629, 633 (7th Cir. 2013) (citation omitted).

In the discrimination context, an employment action is adverse when it involves "a significant change in employment status," *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 235 (7th Cir. 2014)), and is "more

disruptive than a mere inconvenience or an alteration of job responsibilities." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 779 (7th Cir. 2007) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Adverse employment actions typically fall into one of three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–454 (7th Cir. 2011).

Counts III and IV, which allege that Panagakis discriminated against Gaston by directing her to eat lunch at 10 a.m., do not state a plausible claim because they fail to assert any cognizable adverse employment action. At most, directing Gaston to eat lunch at 10 a.m. is the type of mere inconvenience that the Seventh Circuit has repeatedly held does not rise to the level of an actionable adverse employment action. Indeed, the Seventh Circuit has held that changing an employee's schedule without more, is not a materially adverse employment action. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 654 (7th Cir. 2001); *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) ("When an employee's pay, job title, and responsibilities remain the same, a change in the employee's "working hours certainly does not rise to the level of an adverse employment action.").

*Washington v. Ill. Dep't of Revenue*, the sole case cited by Gaston in support of Counts III and IV does not alter this conclusion. In *Washington*, the Seventh Circuit found that when an employer knows of and exploits an employee's vulnerabilities in the retaliation context, "a reassignment that does not affect pay or promotion opportunities" can become materially adverse. 420 F.3d 658, 662 (7th Cir. 2005). Putting aside the differences between adverse

actions in retaliation and discrimination cases, based on the allegations in her Complaint, *Washington* does not fit Gaston's allegations. Gaston has failed to articulate that she had an idiosyncratic vulnerability, has not alleged that Panagakis knew about any such vulnerability, and does not explain how eating lunch at 10 a.m. would exploit that vulnerability. Other than citing *Washington*, Gaston asserts in a conclusory fashion that eating an early lunch "significantly altered Mrs. Gaston's daily working conditions" and "was meant to dissuade Mrs. Gaston from seeking redress for age and race discrimination." (Dkt. 20 at 5.) Putting these bald assertions aside, Gaston again incorrectly recites the definition of an adverse action in retaliation cases, which is broader than the controlling definition for adverse employment actions in discrimination cases. *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 648 (7th Cir. 2005). In discrimination cases, adverse employment actions are confined to tangible impacts with respect to an employee's compensation, terms, conditions, or privileges of employment. Gaston's bald assertions of adversity, without more, cannot save Counts III and IV. She has failed to allege how the terms or conditions of her employment were altered in a tangible way from having to eat an early lunch.

Similarly, Gaston also alleges that her receipt of a single written disciplinary warning on June 24, 2015, was an adverse employment action. Gaston argues, without support, that "just one" written warning can be adverse because a warning *could* impact her ability to be promoted and transfer to a new school. (Dkt. 20 at 6.) As discussed above, to be adverse, the action must materially alter the terms and conditions of employment, not just have the potential to alter the terms of employment. Although a disciplinary warning can be materially adverse if it resulted in an "immediate, albeit non-economic, consequence" such as ineligibility for a promotion, transfer, or advantageous increase in responsibilities," Gaston has failed to allege how the June

8

24, 2015 warning had a tangible adverse impact on the conditions of her employment. The Seventh Circuit has routinely reject similar claims. *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) (finding that plaintiff's "negative evaluation, written warnings, and placement on 'proof status'" were not adverse employment actions because they failed to result in tangible job consequences); *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004) (finding that plaintiff failed to adequately allege adverse employment action because there was no "tangible job consequence accompanying the reprimand"); *Longstreet v. Ill. Dep't of Corrections*, 276 F.3d 379, 384 (7th Cir. 2002) (holding that plaintiff's "negative performance evaluations and being required to substantiate that her absences from work were illness-related . . . did not result in tangible job consequences and therefore are not adverse employment actions actionable under Title VII").

## II.     Intentional Infliction of Emotional Distress (Count XIII)

In addition to her Title VII and ADEA claims, Gaston has also alleged a claim for intentional infliction of emotional distress ("IIED"). In support, Gaston alleged that the Board engaged in extreme and outrageous conduct in subjecting her to a hostile work environment, retaliation, falsely accusing her of child abuse, and by confronting her in a closet. (Dkt. 1 ¶ 115.) The Board has moved to dismiss Gaston's IIED claim because her IIED claim is preempted by the Illinois Worker's Compensation Act ("IWCA") and the Illinois Human Rights Act ("IHRA"). In the alternative, the Board argues that Gaston's IIED count fails to state a claim.

The IWCA provides the exclusive recovery against employers for Illinois workers accidentally injured in the course of their employment. *Luna v. U.S.*, 454 F.3d 631, 634 (7th Cir. 2006). To avoid the application of the IWCA's exclusivity provision Gaston must demonstrate that her injury: "'(1) was not accidental[,] (2) did not arise from his or her employment, (3) was

not received during the course of employment or (4) was noncompensable under the [Workers' Compensation] Act.'" *Ulm v. Mem'l Med. Ctr.*, 2012 IL App (4th) 110421, ¶ 55 (quoting *Collier v. Wagner Castings Co.*, 81 Ill.2d 229, 237 (1980)); *see also Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1016 (7th Cir. 1997).

In this case, the determinative issue is whether the injury was accidental or not. The IWCA's definition of "accidental" is a term of art. Even "injuries inflicted intentionally upon an employee by a co-employee are 'accidental' within the meaning of the Act, since such injuries are unexpected and unforeseeable from the injured employee's point of view. Such injuries are also accidental from the employer's point of view, at least where the employer did not direct or expressly authorize the co-employee to commit the assault. *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 463 (1990). The IWCA's exclusivity provision, however, does not extend to injuries that the employer or its alter ego intentionally inflicted upon the employee or those that which were expressly authorized by the employer. *Id.* at 464. Here, there are no allegations that the Board directly inflicted any injury upon Gaston or expressly authorized any injury. Instead, Gaston argues that Panagakis acted as the Board's alter ego because "when working at Charles H. Wacker Elementary School, the buck stopped with Principal Panagakis." (Dkt. 20 at 7.)

When determining if Panagakis acted as the Board's alter ego, we must consider: (1) her dominance in the Board; (2) whether Panagakis has an ownership interest in the Board; and (3) whether the Panagakis "speaks for" the Board in that she has final decision making authority. *Thompson-Adams v. Renzenberger, Inc.*, No. 10 C 54, 2010 WL 1229380, at *2 (N.D. Ill. Mar. 25, 2010) (quotation omitted). Gaston has not made any allegations that could plausibly lead to the conclusion that Gaston was the Board's alter ego. Gaston does not allege that Panagakis had any influence or dominance in the Board. In fact, she does not allege that Panagakis had any

influence over the Board whatsoever. The second element in the alter ego test is inapplicable in this case, as the Board is a public entity. Lastly, Gaston does not allege that she has final decision making authority in relation to the Board. In fact, she argues the opposite, arguing that Panagakis maintained some control over the school but that the Board "exercised a substantial degree of control over Plaintiff's terms and conditions of employment and abused their authority over Plaintiff when they subjected her to such abuse." (Dkt. 1 ¶ 117.)

Furthermore, it is far from clear that Gaston could ever successfully allege that Panagakis was the Board's alter ego. In fact, district courts within this district have repeatedly held that principals and other school administrators are not the alter egos of school boards, including the Chicago School Board. *See, e.g., Frazier v. Bd. of Educ. of City of Chicago*, No. 03 C 0755, 2003 WL 21510328, at *6 (N.D. Ill. June 27, 2003) (finding that argument that principal was the Board's alter ego was "without merit"); *Rhodes v. Deere*, No. 90 C 20336, 1991 WL 352612, at *8 (N.D. Ill. Oct. 18, 1991) (school district superintendent was not alter ego of board of education); *Brandt v. Bd. of Educ. of City of Chicago*, 420 F. Supp. 2d 921, 937 (N.D. Ill. 2006), aff'd, 480 F.3d 460 (7th Cir. 2007) ("The Board's Rules, however, do not confer the authority for principals to make city-wide policy decisions.").[3]

---

[3] Because the issue of IWCA preemption is dispositive, the Court need not to address the Board's other arguments in detail. Even if the IWCA did not preclude Gaston's IIED claim, however, on the facts alleged, Gaston's IIED claim would fail. The IHRA would likely preempt the majority of her IIED-related allegations, as many of them are "inextricably linked" to her discrimination and retaliation claims because absent the allegations of civil rights violations, there is no independent basis for imposing liability on the Board. *See Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 519, 687 N.E.2d 21, 24 (1997). Any remaining claims, like alleged verbal abuse, do not rise to the level of "extreme and outrageous" conduct needed to succeed on an IIED claim. *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563 (7th Cir. 1997).

## **CONCLUSION**

For the foregoing reasons, the Board's Motion to Dismiss Counts III, IV, VI, VII, and XIII is granted and denied as to Counts I and II.

_____
Hon. Virginia M. Kendall
United States District Judge

Date:  July 31, 2017

12