IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOCELYN GASTON, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) No. 17 C 1024 |
| | ) |
| BOARD OF EDUCATION | ) Judge Virginia M. Kendall |
| OF THE CITY OF CHICAGO, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Jocelyn Gaston was a teacher at Charles H. Wacker Elementary School in the City of Chicago. Gaston previously worked there as a part-time assistant principal, but after the Board of Education hired Ekaterini Panagakis to serve as principal in 2012, Gaston returned to the classroom full-time. Unfortunately, Panagakis and Gaston were unable to get on the same page regarding the appropriate expectations for Gaston.

This federal lawsuit eventually followed, wherein Gaston alleges that Panagakis singled her out because of her race and age, while Panagakis says she acted to improve Gaston's performance. Gaston additionally claims that Panagakis retaliated against her for filing grievances with the Illinois Department of Human Rights charging Panagakis with discrimination.

The Board moved for summary judgment (Dkt. 59) arguing that Gaston is litigating a personality conflict with her former boss. Gaston responded opposing the

Board's motion (Dkt. 63), contending that a genuine dispute of material fact exists therefore necessitating a trial to determine whether the Board created a hostile work environment and retaliated against Gaston for complaining about it. Because there is no such dispute, the Court grants the Board's motion (Dkt. 59) and enters judgment as a matter of law in its favor.

## BACKGROUND

Jocelyn Gaston is a 59-year old, African-American public-school teacher. (Dkt. 61 ¶ 2.) Valerie J. Bratton, the former principal of Wacker, hired Gaston as a pre-school teacher at Wacker Elementary School in 1996. *Id.* ¶ 15. Ekaterini Panagakis became Wacker's new principal in 2012. *Id.* ¶ 17. Panagakis is white and is approximately 48 years old. *Id.* ¶ 18. She is 5'4" tall and weighs about 205 pounds. *Id.* Before Panagakis arrived, Gaston served as a teaching assistant principal. *Id.* ¶ 19. Gaston alleges that, during her time at Wacker, Panagakis used performance evaluations, a lunch assignment, pre-meeting notices, a parent complaint, and meetings to discriminate against her. She now works at Mount Vernon Elementary School, a transfer that Panagakis approved. *Id.* ¶ 63.

**Performance Evaluations**

In 2014, Gaston received her first evaluation under the REACH framework. *Id.* ¶ 24. She scored 284.05, which resulted in a "developing" rating. *Id.* ¶ 23. Four classroom observations, including two conducted by Panagakis, and student test scores contributed to Gaston's score. *Id.* ¶¶ 25–28. Gaston, without citing to any contrary evidence in the record, disputes this fact because she claims it includes legal

and factual argument. (Dkt. 61 ¶ 25.) It plainly does not. (*Id.* (citing Pl. Ex. 11 at 2).) Furthermore, Gaston either does not believe her race was a factor in this performance evaluation or cannot be sure. *Id.* ¶ 29. Because of the "developing" rating, an assistant principal placed Gaston on an improvement plan that provided coaching sessions and other suggestions for instructional improvement. *Id.* ¶¶ 30–32. In 2015, Gaston received her next evaluation, wherein her rating improved from "developing" to "proficient." *Id.* ¶ 33. Panagakis performed all four of the observations that led to this rating. *Id.* ¶ 34.

**Lunch Assignment**

During the 2014–15 school year, Gaston's students' lunch period started at 10:00 a.m., meaning Gaston had to eat her lunch at that time, too. *Id.* ¶ 35. The Board asserts that teachers had the option of eating their own lunch during their preparation periods, however the record only indicates that one teacher, Ms. Whiteford, utilized this alternative opportunity with Panagakis's blessing. (Dkt. 61 ¶ 35 (citing Pl. Ex. C at 326:19–21; 328:19–21).) One other teacher besides Ms. Whiteford received this assignment: Ms. Denton, an approximately sixty-year-old African-American, who ate her lunch with her class. *Id.* ¶ 36.

**Pre-Meeting Notices (PMNs)**

A principal may issue a PMN to a teacher, which means the principal is requesting a meeting to discuss an issue that could result in disciplinary action. *Id.* ¶ 37. A PMN, standing alone, is not a disciplinary action. *Id.* Gaston contends that a "PMN is a summoning for 'formal action' as stated in the union contract," but she

blatantly misreads the text of that agreement. (Dkt. 61 ¶ 37.) In the portion she quotes, the contract identifies the individuals potentially responsible for summoning the employee, including the Chief Executive Officer's "designee for formal action," meaning the principal. *Id.* Clearly, then, the contract merely states that the action "could be adverse." *Id.* Principals, in fact, have discretion to initiate discipline following these meetings and often they do not do so. *Id.*

*June 24, 2015*

Gaston received her first PMN on June 24, 2015, after another teacher reported to Panagakis that she had a verbal disagreement with Gaston. *Id.* For the purposes of this motion, the exact date that Panagakis received notice of the altercation is immaterial. The record shows that it happened sometime after the incident but before sending the email, which adds up to about a week. (Dkt. 61 ¶ 38.) Whether or not this altercation in fact occurred is also immaterial seeing that another teacher made an allegation and that is all Panagakis conveyed. *Id.*

Initially, the meeting was not of a disciplinary nature, but to accommodate Gaston's request that a union representative be present, Panagakis sent a formal meeting notice to include that individual. *Id.* ¶¶ 40–41. After investigating the matter and determining that there was "no evidence supporting the need to move forward with a meeting," Panagakis closed the matter and the parties never met. *Id.* ¶ 43. When questioned, Panagakis failed to remember the specific steps she took to investigate the verbal abuse allegation. (Dkt. 68 ¶ 13.) Gaston quarrels with the Board's characterization of the facts as rescinding the PMN, but the record shows Panagakis

canceled the meeting and closed the matter. (Dkt. 61 ¶ 43.) Whether one might call it rescinding the notice or not, the facts remain that the parties never met and therefore Gaston never received any discipline. Even so, Gaston believes she received this notice because of her race, although she is unaware if the other teacher, a white woman, received a PMN, too. *Id.* ¶ 42. This interaction caused Gaston to experience shock because she denied ever verbally abusing another teacher. (Dkt. 68 ¶ 5.)

*December 1, 2015*

Panagakis issued Gaston her second PMN for insubordination on December 1, 2015. (Dkt. 61 ¶ 47.) They then met on December 9 in the school library, where the assistant principal and union representative were also present. *Id.* ¶ 48. This meeting resulted in Panagakis giving Gaston a written warning or performance improvement plan ("PIP"), which discussed Gaston's claimed failure to evaluate a student for specialized services after multiple requests, in addition to alleging that Gaston neglected to provide Panagakis with a copy of the flyer invitation to an open house. *Id.* ¶¶ 49–50; Dkt. 68 ¶ 16.

In other words, the PIP generally identified the issues and included suggestions to correct the supposed weakness. *Id.* ¶ 51. Gaston asserts that she did, in fact, complete her duties, but whether she knew she had to fill out a form is neither here nor there. (Dkt. 68 ¶¶ 16–17.) Gaston alleges that Panagakis pointed at her, yelled at her, and slammed her fists on a table during the meeting because Gaston is African-American; however, Gaston can point to no evidence in the record showing that Panagakis treated anyone else this way, including those other teachers that share

Gaston's race. *Id.* ¶ 52. The Board, for its part, denies this happened. (Dkt. 68 ¶ 18.) Gaston states that she went into some type of shock and thereafter drove herself to her doctor's office. *Id.*

*January 29, 2016*

On January 29, 2016, emergency personnel took one of Gaston's students to the hospital after he severely injured his finger. *Id.* ¶ 53. Even though the Teacher & Staff Handbook tasked Gaston with submitting a student injury report that same day, she failed to do so and instead turned in the report the next school day. *Id.* ¶¶ 55–56. Consequently, Panagakis served Gaston with a PMN. *Id.* ¶ 57. After further consideration, however, Panagakis rescinded the PMN, and Gaston's issue with Panagakis's state of mind is accordingly beside the point. *Id.* ¶ 58.

Later that morning, Panagakis went to Gaston's classroom and found her in the closet. *Id.* ¶¶ 59–60. The parties dispute the following facts, however Gaston stated that Panagakis entered the dark closet and closed the door behind her. *Id.* ¶ 61; Dkt. 68 ¶¶ 20–21. Gaston felt physically threatened by Panagakis once she started to repeatedly demand that Gaston return the envelope containing the PMN that Gaston gave to her earlier. *Id.*; Dkt. 68 ¶¶ 23–25. Even so, Panagakis never physically touched Gaston in the closet, nor had she ever in the past. *Id.* ¶ 62. When Panagakis continued to yell at and approach Gaston, Gaston asked her to leave, which Panagakis eventually did. *Id.* ¶ 61; Dkt. 68 ¶¶ 22–25. This run-in left Gaston feeling scared, anxious, and threatened. (Dkt. 68 ¶ 26.)

*November 2017*

Gaston received a second warning in November 2017 when she allegedly prevented a child from attending school. *Id.* ¶ 27. Gaston denies she ever did such a thing. *Id.* When asked about written reprimands more generally, Panagakis could not recall each one she had issued and to whom. *Id.* ¶ 28. Still, both parties agree that Panagakis disciplined Ms. LaTanya Jones Jackson and Ms. Marian Hoofe-Reynolds during their respective tenures at Wacker, both African-American accusers of Panagakis for race discrimination. *Id.* ¶¶ 29–30. For instance, Jones Jackson complained about one time when Panagakis called her a "thug" in front of students. *Id.* ¶ 31. The Board disputes this fact and says that Panagakis used the word to illustrate a point to the students, which perhaps raised an inappropriate implication. *Id.*

**Parent Complaint**

Gaston also felt like Panagakis blamed her for a parent's complaint regarding a November 2015 incident where a child sat in wet, urinated pants for an extended period. *Id.* ¶ 44. The parent felt the school's inaction constituted "child abuse." *Id.* Although the parent did not direct the complaint at Gaston and the school notified the whole team of teachers responsible for the child, Gaston feels like she bore the brunt of it because Panagakis blamed her. *Id.* ¶¶ 44–45; Dkt. 68 ¶ 10. Gaston was upset and horrified as a result. (Dkt. 68 ¶ 9.) Although she claims that Panagakis threatened to publicize this incident, the Board disputes that fact. *Id.* ¶ 8. Gaston received no PMN for this complaint and she is unaware if any other teachers did or not. (Dkt. 61 ¶ 46.)

**Time Magazine**

Finally, the parties do genuinely dispute the facts surrounding another November 2015 encounter. Gaston contends that Panagakis placed a copy of Time Magazine in the mailboxes of the African-American literacy teachers to intimidate and harass them with a headline that read: "Rotten Tomatoes: It's Nearly Impossible to Fire a Bad Teacher." (Dkt. 68 ¶ 6.) When Gaston confronted Panagakis about this, she says Panagakis told her that: "I would never call you a rotten apple, just a pain in my ass." *Id.* Gaston further claims that Panagakis did not put the magazine in the white literacy teacher's mailbox. *Id.* ¶ 7. The Board denies these events ever occurred. *Id.* ¶¶ 6–7. All in all, Gaston's interactions with Panagakis left her feeling depressed, anxious, afraid, isolated, and lonely. (Dkt. 68 ¶ 34.)

## STANDARD OF REVIEW

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, then, the Court construes all facts and draws all reasonable inferences in favor of the non-movant. *See Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (citing *Wilson v. Adams*, 901 F.3d 816, 820 (7th Cir. 2018)). The parties genuinely dispute a material fact when "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

The Board moved for summary judgment on the eight remaining claims in this lawsuit: Count I (hostile work environment based on race); Count II (hostile work environment based on age); Count V (retaliation for union complaint in the form of the June 24, 2015 PMN); Count VIII (retaliation for union complaint in the form of the June 24, 2015 PMN); Count IX (retaliation for filing June 26, 2015 discrimination charge in the form of child abuse accusation); Count X (retaliation for June 26, 2015 discrimination charge in the form of reprimand for insubordination); Count XI (retaliation for filing June 26, 2015 discrimination charge in the form of performance improvement plan); and Count XII (retaliation for filing December 17, 2015 discrimination charge in the form of PMN for student injury and closet incident).

Before diving into the merits, there are three preliminary issues that need to be initially addressed. First, the Court *sua sponte* strikes Count VIII from the complaint because it is redundant of—and nearly identical to—Count V. *See Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1142 (7th Cir. 2009) (citing Fed. R. Civ. P. 12(f)(1)). Second, by failing to raise any arguments in support of the hostile work environment claim alleged under the Age Discrimination in Employment Act in Count II, Gaston forfeited that claim. *See Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (citation omitted). Even if she did

not forfeit the claim, there is absolutely no evidence whatsoever in the record from which a reasonable factfinder could draw on to return a verdict for her on the age claim. Gaston's age was not the cause of her alleged discrimination.

Third, all five retaliation claims (Counts V and IX–XII) suffer from the same fatal flaw: The Board took no adverse employment action against Gaston. Whether a plaintiff elects to prove a retaliation claim through the direct or indirect method, she must prove that she suffered an adverse action. *See Swyear v. Fare Foods Corp.*, No. 18-2108, 2018 WL 6787325, at *7 (7th Cir. Dec. 26, 2018). Gaston contends that the following constitute adverse actions: PMNs, a child abuse accusation, a reprimand, a performance improvement plan, and a closet confrontation. As a matter of law, none of them suffice. *See Lewis v. Wilkie*, 909 F.3d 858, 870 (7th Cir. 2018) (unfulfilled threats and false accusations) (collecting cases); *Malekpour v. Chao*, 682 F. App'x 471, 474 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 415 (2017), *reh'g denied*, 138 S. Ct. 732 (2018) (same); *Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017) (negative performance reviews, written warning, and PIP); *Burton v. Bd. of Regents of Univ. of Wisconsin Sys.*, 851 F.3d 690, 696 (7th Cir. 2017) (written reprimand); *Poullard v. McDonald*, 829 F.3d 844, 856—57 (7th Cir. 2016) (letter of admonishment and other unfulfilled threats) (collecting cases); *Porter v. City of Chicago*, 700 F.3d 944, 954–55 (7th Cir. 2012) (written reprimand) (collecting cases); *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107–08 (7th Cir. 2012) (mild epithets) (collecting cases); *Cole v. Illinois*, 562 F.3d 812, 816–17 (7th Cir. 2009) (improvement plan) (collecting cases); *de la Rama v. Illinois Dep't of Human Servs.*, 541 F.3d 681, 686 (7th

Cir. 2008) (negative performance evaluations) (collecting cases); *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008) (same); *see also, e.g.*, *Fields v. Bd. of Educ. of City of Chicago*, No. 15 C 4581, 2017 WL 4099845, at *5 (N.D. Ill. Sept. 15, 2017) (threat of termination and PMNs). Because Gaston failed to establish an essential element of her retaliation claims, the Court grants the Board's motion and enters judgment for it on Counts V, IX, X, XI, and XII.

I. **Racially Hostile Work Environment (Count I)**

With those matters taken care of, that leaves one claim left in this case, Count I, which alleges the Board subjected Gaston to a racially hostile work environment. This claim also needs a quick word at the top: Gaston may only recover for acts falling outside the 300-day limitations period that form the single unlawful employment practice she alleges not already disposed of: race discrimination. *See Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)).

A. **Statute of Limitations**

Put differently, age discrimination, race discrimination, and retaliation are *multiple* unlawful employment practices separately proscribed by Title VII. *See Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir. 2012); *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011); *Reese v. Ice Cream Specialties, Inc.*, 347 F.3d 1007, 1010 (7th Cir. 2003); *see also* 42 U.S.C. § 2000e–2(m) (providing that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, *or* national origin was a motivating factor for any

employment practice, even though other factors also motivated the practice") (emphasis added); *cf. Littlejohn v. City of New York*, 795 F.3d 297, 323–24 (2d Cir. 2015).

Here, the only conduct that stems from before August 2014 is Gaston's 2014 performance evaluation. *See supra* pp. 2–3. This incident formed the basis for the already disposed of retaliation charge in Count XI (a discrete act) and does not clearly relate to Gaston's hostile work environment claim. Accordingly, the Court will not consider it. Even assuming Gaston tied these facts to her hostile work environment claim, that would not save it from summary judgment because race discrimination was not the reason for Gaston's subpar rating. *See supra* pp. 2–3 (detailing how Panagakis's actions only partially contributed to Gaston's "developing" evaluation while Panagakis played a larger role in Gaston's later improved "proficient" rating); *id.* ("Gaston either does not believe her race was a factor in this performance evaluation or cannot be sure"). The reason school administration placed Gaston on a performance improvement plan is Gaston failed to meet the Board's expectations. So, besides the 2014 performance evaluation, all other factual allegations reasonably relate to Gaston's charges of racial discrimination and can add up to her hostile work environment claim.

### B. Merits

On the merits of her hostile work environment claim, Gaston must show that: (1) the Board subjected her to unwelcome harassment; (2) the Board harassed her because of her race; (3) "the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment"; and

(4) there is a basis for employer liability. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) (citing Alamo v. Bliss, 864 F.3d 541, 549 (7th Cir. 2017)); *see Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018), *reh'g denied* (July 24, 2018). The Board does not contest the fourth element, conceding there is a basis for employer liability. Furthermore, the Court may assume without deciding that the Board subjected Gaston to unwelcome harassment seeing that there is not enough evidence for a reasonable jury to find that the Board harassed Gaston because of her race or that the harassment was severe or pervasive.

    i.    **Causation**

Beginning with the second element, Gaston's race must be the basis for the alleged harassment. *See Pearson v. Advocate Health Care*, 727 F. App'x 866, 869 (7th Cir. 2018) (explaining that the harassment of which the plaintiff complains must be connected to race) (citations omitted); *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (reasoning that the record must "link" the defendant's actions to retaliatory animus); *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) (stating that, "[a]lthough a connection between the harassment and the plaintiff's protected class need not be explicit, 'there must be some connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority.'") (quoting *Zayas v. Rockford Memorial Hospital*, 740 F.3d 1154, 1159 (7th Cir. 2014)).

In this case, there is almost no evidence of racial animus in the record. Gaston's "evidence" consists of her own self-serving allegations based entirely on her own

assumptions. For instance, Gaston claims the Board discriminated against her because she received a PMN after she had a disagreement with a white teacher, but Gaston admitted to being uncertain that the other teacher did not also receive a PMN. (Dkt. 61 ¶ 42.) Regardless, the Board elected not to proceed on that PMN and it never amounted to anything. *Id.* ¶ 43.

Taking another example, Gaston asserts that, when Panagakis yelled, pointed, and slammed her fists at Gaston during the library meeting, she did so because of Gaston's race. Gaston speculates that Panagakis never behaved this way toward any other teacher, however she offered no proof of that. Moreover, Gaston failed to show that Panagakis's motivation was indeed racial animus. *Cf. Cole*, 838 F.3d at 897 (concluding that innocuous events being connected to race only insofar as they happened to a person of color is not enough to raise a genuine factual dispute). For these same reasons, Gaston's Time Magazine allegation does not cut it either.

The closest Gaston comes to a hint of racial animus is her disputed allegation that Panagakis called another teacher a "thug," which of course is a racially-charged word. *See, e.g.*, *Thelwell v. City of New York*, No. 13 CV. 1260 JGK, 2015 WL 4545881, at *10 (S.D.N.Y. July 28, 2015), *aff'd*, 733 F. App'x 561 (2d Cir. 2018); *Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201, 218–19 (N.D. Ill. 2014); *see also* Andrea Freeman, *Racism in the Credit Card Industry*, 95 N.C. L. Rev. 1071, 1114 (2017); Bryan Adamson, *"Thugs," "Crooks," and "Rebellious Negroes": Racist and Racialized Media Coverage of Michael Brown and the Ferguson Demonstrations*, 32 Harv. J. Racial & Ethnic Just. 189, 232 (2016); D. Marvin Jones, *"He's A Black Male . . . Something Is*

*Wrong with Him!" the Role of Race in the Stand Your Ground Debate*, 68 U. Miami L. Rev. 1025, 1044 (2014).

That said, Panagakis purportedly made the comment to somebody else and one isolated incident is usually not enough to overcome a plaintiff's high bar. *See Romaniszak-Sanchez v. Int'l Union of Operating Engineers, Local 150*, 121 F. App'x 140, 145 (7th Cir. 2005) (noting "second-hand" harassment is less objectionable and that a plaintiff has no claim where the defendant did not direct the harassment at her); *Mahone v. CSX Transportation, Inc.*, 652 F. App'x 820, 823–24 (11th Cir. 2016) (recognizing that a single incident is typically too isolated to establish severity or pervasiveness).

A jury could easily infer that Gaston's perpetual personality conflict with Panagakis caused her misfortune and not her race. *See Pearson*, 727 F. App'x at 869. Gaston therefore failed to "supply the connection . . . between the harassing conduct and her race." *Id.*; *see Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158–59 (7th Cir. 2014) (rejecting broad conclusions that other employees were not "subject to similar harassment, singled out, and subjected to unwarranted discipline" as insufficient). Gaston therefore failed to proffer sufficient evidence to demonstrate that her race was the cause of her harassment. *Cf.* Dkt. 61 ¶ 29 (indicating that Gaston did not believe her race was a factor in a performance evaluation or that she could not be sure it was).

### ii. Objective Offensiveness

Ending with the third element, the Board needed to severely or pervasively harass Gaston for her hostile work environment claim to survive summary judgment. Although generally a question of fact for the jury, if a court determines that no reasonable jury could find the conduct at issue severe or pervasive, then summary judgment is appropriate. *See Johnson*, 892 F.3d at 901. Whether harassment meets this standard requires consideration of "the severity of the conduct, its frequency, whether it is merely offensive as opposed to physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance." *Swyear*, 2018 WL 6787325, at *4 (citing *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018)). Because Title VII "'does not prohibit harassment alone, however severe and pervasive.'" *Coles v. Post Master Gen. United States Postal Servs.*, 711 F. App'x 890, 897–98 (11th Cir. 2017) (citation omitted).

Here, the conduct consists of the Time Magazine incident, the lunch assignment, yelling (and pointing and screaming), PMNs, a child abuse accusation, and a written warning. These allegations, even when taken together, do not constitute severe or pervasive harassment. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015–16 (7th Cir. 2018) (deciding that "short tempered, hostile, unfairly critical, and disrespectful" supervisors, who subjected the plaintiff to "excessive monitoring," are not objectively offensive, severe, or pervasive work conditions); *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (holding that intimidation, by being stared and yelled at, is not an actionable harm).

Sure, Panagakis and Gaston had an unpleasant relationship, but such "unpleasantries . . . are, unfortunately, not uncommon in the workplace." *Swyear*, 2018 WL 6787325, at *4. The Supreme Court and Seventh Circuit consistently remind district courts and litigants that Title VII "does not set forth a general civility code for the American workplace." *Lewis*, 909 F.3d at 867 (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (internal punctuation omitted). Congress expects "a certain level of maturity and thick skin from employees" because the "[d]iscrimination laws do not mandate admirable behavior from employers, through their supervisors or other employees." *Johnson*, 892 F.3d at 900–01.

Although perhaps not a model of admirable interactions between a principal and teacher, this is a case where the conduct does not rise to the level that alters the terms and conditions of employment. *See id.* at 901. For her part, Gaston's rating rose to "proficient," she rated herself a "ten [out of ten], teacher of the year," and she continues to work for the Board. (Dkt. 61 ¶¶ 22, 33.) On this record, then, Gaston failed to show that the conduct was severe or pervasive enough to interfere with her work performance. Therefore, Gaston cannot establish two essential elements of her hostile work environment claim, which entitles the Board to summary judgment on Count I.

## CONCLUSION

Because the Board did not subject Gaston to a racially hostile work environment and otherwise showed that there is no genuine dispute as to any material fact, the Court grants its motion (Dkt. 59) and enters judgment as a matter of law in its favor.

Date: January 31, 2019

_____
Virginia M. Kendall
United States District Judge